David WILLIAMSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Alexis D. NICHOLS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 477, 481, 1996.

Supreme Court of Delaware.

Submitted: Nov. 19, 1997.
Decided: Jan. 16, 1998.
Rehearing Denied Feb. 27, 1998.

Leo John Ramunno, Wilmington, for Appellant Williamson.

Anthony A. Figliola, Jr., of Figliola & Facciolo, Wilmington, for Appellant Nichols.

John Williams (argued), Deputy Attorney General, Department of Justice, Dover, for Appellees.

Timothy J. Donovan, Jr., Deputy Attorney General, Department of Justice, Wilmington, for Appellee in No. 477, 1996.

Before VEASEY, C.J., WALSH, HOLLAND and HARTNETT, JJ., and STEELE, Vice Chancellor,[1] constituting the Court en Banc.

STEELE, Vice Chancellor:

This is a consolidated appeal from numerous criminal convictions in the Superior Court in and for New Castle County. A jury found the co-defendants below/appellants, David Williamson and Alexis D. Nichols, guilty of first degree assault, attempted extortion and second degree conspiracy in connection with the stabbing of Alexander Osborne. In addition, the jury found Williamson guilty of two counts of possession of a deadly weapon during the commission of a felony, and it found Nichols guilty of maintaining a dwelling, two counts of possession of a deadly weapon during the commission of a felony, possession of drug paraphernalia, possession of marijuana and possession of cocaine.

The appellants raise several arguments on appeal. First, they both contend that the trial court violated their rights under the Confrontation Clause of the United States Constitution by admitting into evidence two of Osborne's statements to third parties when he was not present to undergo cross-examination. Nichols also argues that the trial court erred by denying his motion to suppress several pieces of physical evidence and a confession on the grounds that they

---

1. Sitting by designation pursuant to Del. Const., art. IV §§ 12 and 38, and Supreme Court Rules 2 and 4(a).

were illegally seized. Williamson also argues that the trial court erred by: (1) refusing to allow him effective cross-examination of a witness, (2) reducing the number of peremptory challenges granted to the defendants, and (3) imposing consecutive sentences for each of his convictions, rather than finding that several offenses merged. We conclude that each of the arguments lacks merit and affirm the convictions.

### Facts

The evidence adduced at trial tended to indicate that on November 28, 1995, Nichols hired Williamson to collect from Osborne a $370 debt on Nichols' behalf. Nichols agreed to pay Williamson $500 for his efforts. Raymond Zecca, the appellants' mutual acquaintance, overheard them develop their plan, and he inferred from their conversation that the attempt to collect the money might lead to violence.

Early the next morning, Zecca drove Williamson, in a blue pickup truck, to the Delaware Auto Court, a motel where Osborne lived. Zecca dropped Williamson off in front of the motel and waited outside in the truck. Zecca later testified that, when Williamson returned to the truck, approximately ten to fifteen minutes later, he was out of breath, his shirt was bloodstained, and he possessed a knife. No evidence indicated whether or not Williamson had the knife when he entered the motel room. Zecca and Williamson fled the scene.

Janet Gerber, the manager of Delaware Auto Court, testified that, at approximately 6:55 a.m. on November 29, Osborne appeared at Gerber's office and asked her to call 911. Gerber testified that the shirtless Osborne was bleeding from what appeared to be four or five stab wounds. Gerber described Osborne as alert, angry and in excruciating pain. Blood dripped out of Osborne's mouth as he spoke, and he continually asked for water. Gerber made the call to 911, and she remained on the telephone, asking Osborne questions and relaying his answers to the dispatch operator. Osborne told Gerber that Williamson had stabbed him, and Gerber, in turn, told that to the 911 operator. Gerber later testified that she feared Osborne might

die in her office and that the events of November 29—not surprisingly—"were not ordinary."

Dr. Amir Mansoory, a general surgeon, treated Osborne at Christiana Hospital. Dr. Mansoory testified that Osborne would have died had he not been treated within thirty to sixty minutes of the stabbing.

Immediately after the stabbing, Zecca and Williamson drove to the New Castle Motel for a "breath of air" and then rented a room at Shoney's Inn. Later, while at Shoney's Inn, Williamson told Zecca that "things got out of hand" at the Delaware Auto Court and that "[Williamson and Osborne] got to fighting and cussing and beating each other up." Later that day or early the next day, Zecca repeated Williamson's account to Nichols.

The next day, November 30, 1995, Detective Paul Smentkowski visited Osborne at the hospital. Osborne told Detective Smentkowski that Williamson had stabbed him and identified Williamson in a photographic lineup. Osborne was reluctant to give his name when asked. He gave a home address in Suffolk, Virginia. Detective Smentkowski later testified that he never verified Alexander Osborne to be the man at Christiana Hospital or the accuracy of the Suffolk, Virginia address.

Also on November 30, Detective Thomas Ford learned of an outstanding warrant for Zecca's arrest for various probation violations and received information that Zecca might be found at the New Castle Motel in room 26, 27, 38, 42 or 23. Detective Ford later testified that he was aware at the time that Zecca was a suspect in an attempted murder but was almost certain that he was not yet in custody. Detective Ford did not obtain a search warrant for any of the rooms because he intended only to knock and ask questions.

Detective Ford and his colleague, Detective Bramble, arrived at room 38 and found the door ajar. Ford announced his presence and knocked on the door, causing it to open further. Through the open door, Ford could see an African–American man, later determined to be Nichols, sleeping on the bed. Detective Bramble testified that he and De-

tective Ford could also see, on the bedside table, a gun, several small bags of what appeared to be marijuana and several pills. Ford and Bramble entered the room and arrested Nichols. As they were doing so, they discovered another gun and a bullet-proof vest in the room. The police seized two loaded revolvers, twelve plastic bags of marijuana, two capsules of cocaine, an electronic scale, a hand scale, plastic baggies, a bulletproof vest and cash.

At the police station, Detective Ford read Nichols his *Miranda* rights and questioned him. Nichols confessed that he rented and sold drugs out of room 38. He also admitted that he owned the two guns found there and that he knew they were loaded. He further admitted that he, Zecca and Williamson had a private meeting at the New Castle Motel, during which Nichols offered Williamson $500 to beat up Osborne and collect $370 from him. Nichols repeated to the police what Zecca had learned from Williamson about the events in the motel room: that "[Williamson and Osborne] got to fighting" and that "[Osborne] got the upper hand on [Williamson] and [Williamson] wound up pulling out the knife, stabbing [Osborne]."

Williamson and Zecca were arrested on November 30. Zecca was charged with conspiracy in connection with the stabbing. Zecca gave a statement to the police in which he repeated Williamson's account of what happened in the motel room. Zecca pleaded no contest and was the State's primary witness against the appellants at their joint trial.

Jennifer Ellis, who lived at the Delaware Auto Court on the day in question, testified that one morning in November of 1995, at approximately 7:00 a.m., she noticed a blue truck sitting on the side of the road with a white male in the driver's seat. She also testified that she saw a white male stabbing a black male whom she knew to live in Room 26. Immediately after the stabbing, the white male fled the scene in the truck. At trial, Ellis identified in a photograph Williamson's blue pickup truck as the truck she had seen at the Delaware Auto Court.

The State attempted to locate Osborne before trial. The State sent two certified letters, which were returned. Detective Smentkowski twice called the Suffolk, Virginia police and asked them to look for Osborne at the address he had given. Osborne was not at the address on either occasion. On the second visit, the residents of the house told the Suffolk police that Osborne had not lived at that address for approximately one year, although they continued to receive his mail from time to time.

Additional facts relevant to the disposition of the issues will be discussed below.

## I.

The appellants first contend that the trial court violated their right to confront the witnesses against them, as guaranteed by Sixth Amendment to the United States Constitution.[2] This Court reviews *de novo* claims alleging the infringement of a constitutionally protected right,[3] and we review for an abuse of discretion questions concerning the admissibility of evidence.[4]

We note at the outset of our analysis that, if we were to find that the trial court violated the appellants' rights under the Sixth Amendment, the error would be harmless as to Nichols. Nichols confessed to the police that he hired Williamson to beat up Osborne. Thus, we can say beyond a reasonable doubt that there was no possibility that the disputed evidence may have contributed to Nichols' conviction.[5] The legality of Nich-

2. The Confrontation Clause states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. CONST., amend. VI. The Confrontation Clause of the Sixth Amendment is made applicable to the States through the Fourteenth Amendment. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

3. *Stigars v. State*, Del.Supr., 674 A.2d 477, 481 (1996).

4. *Tice v. State*, Del.Supr., 624 A.2d 399, 401 (1993).

5. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–11 (1967).

ols' confession is discussed in section II, *infra.*

Osborne was not present at the appellants' trial to testify to the identity of his attacker. The trial court, however, admitted into evidence the tape recording of Gerber's call to 911 [6] and Osborne's statement to Detective Smentkowski the day after the stabbing. Both contained statements identifying Williamson as Osborne's attacker. The 911 tape was admitted as a present sense impression [7] and as an excited utterance,[8] and the statement to Detective Smentkowski was admitted under the residual hearsay exception.[9] The appellants argue that the trial court should have excluded the two hearsay statements because Osborne was not present in the courtroom to undergo cross-examination. Quoting *Ohio v. Roberts,*[10] a decision of the United States Supreme Court, the appellants argue that the admission of hearsay statements violates an accused's rights under the Confrontation Clause unless "(1) the declarant is unavailable to testify and (2) the statement bears adequate indicia of reliability."[11] The appellants contend that the State did not satisfy the "unavailability" prong of the test because it did not make a reasonable attempt to secure Osborne's presence at the trial.

Appellants are correct that the case law of the United States Supreme Court controls our decision. That Court has analyzed defendants' rights under the Confrontation Clause since *Ohio v. Roberts,* however, and it has narrowed considerably the scope of *Roberts'* holding.[12]

In *[United States v.] Inadi* ... we rejected the proposition that Roberts established a rule that 'no out-of-court statement would be admissible without a showing of unavailability.' To the contrary, ... we concluded that 'Roberts must be read consistently with the question it answered, the authority it cited, and its own facts.'[13] The Court concluded that: "Roberts stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding."[14]

The basic purpose of the Confrontation Clause is to promote the integrity of the factfinding process.[15] Thus, the United States Supreme Court's primary concern when assessing the admissibility of hearsay statements, and the impact on a defendant's rights under the Confrontation Clause, is that the statements sought to be admitted be reliable and trustworthy. Thus, in *United States v. Inadi,*[16] the Court admitted co-conspirator statements without finding the declarant to be unavailable, stating that such statements "provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court."[17] In *White,* the Court stated that its observations in *Inadi* also applied in the context of the hearsay exceptions for spontaneous declarations and for statements made while seeking medical treatment: "[S]uch out-of-court declarations are made in contexts that provide substantial guarantees of their trustworthiness. *But those same factors that contribute to the statements' relia-*

---

**6.** Gerber also testified as to what happened that morning, but the State did not move her testimony into evidence under 11 *Del.C.* § 3507.

**7.** D.R.E. 803(1).

**8.** D.R.E. 803(2).

**9.** D.R.E. 803(24).

**10.** 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

**11.** *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608.

**12.** *See, e.g., United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986); *White v.*

*Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).

**13.** *White,* 502 U.S. at 353–54, 112 S.Ct. at 741, 116 L.Ed.2d at 858 (citations omitted).

**14.** *Id.* at 354, 112 S.Ct. at 741, 116 L.Ed.2d at 858.

**15.** *Id.* at 356–57, 112 S.Ct. at 743, 116 L.Ed.2d at 860.

**16.** 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

**17.** *United States v. Inadi,* 475 U.S. 387, 395, 106 S.Ct. 1121, 1126, 89 L.Ed.2d 390, 398 (1986).

*bility cannot be recaptured even by later in-court testimony.*"[18]   Indeed, in *White* the Court declared that any statements that can be admitted under a "firmly rooted" hearsay exception possess the requisite reliability to be admitted without a finding of unavailability.[19]

▮▮ Because it analyzed and admitted the 911 tape under two "firmly rooted" hearsay exceptions, nothing required the trial court to make a finding that the declarant was unavailable to testify at trial or to make a separate finding of the reliability of the statements.[20]   The 911 tape satisfies the Confrontation Clause under *White.*[21]   Although Detective Smentkowski's statements were not admitted under a "firmly rooted" hearsay exception, we hold that an unavailability analysis is, likewise, unnecessary *under the particular circumstances of this case.* As in *Inadi* and *White*, the hearsay statements at issue in this case were made in a context that provided indicia of reliability that could not be recaptured by later in-court testimony.   As the trial court noted: when the victim of a violent attack identifies his attacker in a statement to the investigating police officer, he has "a strong motivation to be truthful."[22]   Like statements made for purposes of medical diagnosis or treatment, "[a] victim of an assault is likely to have a similarly strong motivation to assure that his or her assailant is correctly identified, located, tried and convicted in order to prevent another assault."[23]   Osborne's statement to Detective Smentkowski is close in time to and provides an independently-based, reli-able check on the accuracy of the identification of the assailant's identity consistent with the 911 tape and Nichols' and Zecca's statements to the police explaining that Nichols hired Williamson to beat up Osborne.

The appellants make several additional arguments concerning the admissibility of Osborne's hearsay statements, but we find each meritless.   The first argument is little more than a variation on the Confrontation Clause argument.   The appellants contend that the trial court was required to make a finding of Osborne's unavailability under D.R.E. 804(a). We disagree.   The 911 tape and the hearsay portions of Detective Smentkowski's testimony were admitted under exceptions listed in D.R.E. 803.   D.R.E. 804 is wholly inapplicable to the instant case.

▮▮ The appellants next argue that the trial court improperly admitted the hearsay portions of Detective Smentkowski's testimony because, contrary to D.R.E. 803(24), the State failed to provide Osborne's address. As required by that Rule, the State sent the appellants a letter providing notice of its intent to introduce the statements of an unavailable witness.   The State attached to the letter a summary of Osborne's statement, from which the Suffolk, Virginia address had been deleted.   The letter stated: "Unless I hear from you to the contrary, I will assume you do not need his address for 803(24) purpose[s]."   By the time the State sent the letter, both the State and the appellants had a copy of Osborne's purported address in

**18.**  *White,* 502 U.S. at 355–56, 112 S.Ct. at 742, 116 L.Ed.2d at 859 (emphasis supplied).

**19.**  *Id.* at 355–57, 112 S.Ct. at 742–43, 116 L.Ed.2d at 859–60.

**20.**  *Id.* Hearsay that falls within a "firmly rooted" exception also has "sufficient indicia of reliability to satisfy the reliability requirement posed by the Confrontation Clause." *Id.* at 356 n. 8, 112 S.Ct. at 743 n. 8, 116 L.Ed.2d at 859 n. 8 (citing *Idaho v. Wright,* 497 U.S. 805, 817, 820–21, 110 S.Ct. 3139, 3147, 3149–50, 111 L.Ed.2d 638 (1990); *Bourjaily v. United States,* 483 U.S. 171, 182–84, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987)).

**21.**  *See Gannon v. State,* Del.Supr., 704 A.2d 272, 274–75 (1998).

**22.**  *See   Government of Virgin Islands v. Joseph,* 964 F.2d 1380, 1388 (1992) (opting not to decide case on this basis because argument not developed in court below).   In *Joseph,* the declarant/victim was deceased, and his/her hearsay statement was admitted under 804(b)(5).   Thus, the United States Court of Appeals for the Third Circuit was analyzing the hearsay statement for indicia of reliability that would satisfy the Confrontation Clause, not whether an unavailability analysis was necessary.   The analysis is equally applicable to the issue in this case, however, because, under *White,* the same factors that make a statement reliable for Confrontation Clause purposes also make an analysis of unavailability unnecessary.

**23.**  *Id.*

their possession, and all knew that Osborne did not actually live at the address. Thus, the trial court found that, had the State strictly complied with D.R.E. 803(24), the result would have been no more meaningful to the defendants under the circumstances or more consistent with the objective policy of the rule. Under the circumstances of this case, we hold that the trial court's ruling constituted no abuse of discretion.

The appellants now argue, however, that the State did not comply with D.R.E. 803(24) because it provided to the appellants, via those earlier documents, an address the State knew was false. The State knew only that the address may have been inconsequential because it had tried, unsuccessfully, to locate Osborne. There is absolutely no contention, nor would the record support one, that the State either knowingly recorded a false address or consciously hid the known correct address from the appellants. The State turned over all of the information it had; D.R.E. 803(24) requires nothing more.

■ The appellants next contend that the trial court improperly admitted the 911 tape as an excited utterance under D.R.E. 803(2). In addition to the State's evidence supporting the admission of the tape under the excited utterance exception, the trial court considered responses to its own extensive examination of Gerber. The trial court concluded that the testimony supported circumstances constituting an excited utterance, and after a careful review of the record, we hold that sufficient facts support the trial court's conclusion.[24]

The appellants next contend that in *State v. MacDonald*,[25] this Court held that a victim's statement may not be admitted "for the purpose of identifying the defendant as a killer." The appellants misconstrue *MacDonald*. In that case, we considered whether the hearsay statements of a deceased victim that she intended to visit the defendant would be admissible in his impending trial for murder under D.R.E. 803(3). In the course of our analysis, we stated that the victim's statements might be admissible to show her present purpose or intention when she made the statements and, inferentially, her future conduct but that they would not be admissible to show the defendant's intent or future conduct.[26] We deferred our decision on the defendant's Motion in Limine, however, pending a hearing to determine whether the requirements for admissibility under D.R.E. 803(3) had been met.[27] Nothing stated in *MacDonald* supports the appellants' contentions.

■ Finally, Williamson states in his brief, unsupported by additional argument or authority, that the trial court should have admitted Osborne's entire statement to Detective Smentkowski rather than simply the portion offered by the State. The trial court explained that it could admit under D.R.E. 803(24) and the Confrontation Clause only as much of the statement as had indicia of reliability. The trial court found that only the portion of the statement that identified Williamson as the attacker met that standard.[28] This Court, attempting to give Williamson every opportunity to explain his theory, asked at oral argument if by raising this claim Williamson intended to argue that he was prevented from developing self-defense. Williamson expressly stated that he did not, in this section of his argument, intend to raise any claim related to self-defense. Thus, we hold that any argument that might have been raised as to self-defense based on lack of confrontation has been abandoned and that the trial court did not abuse its discretion by admitting only as much of Detective Smentkowski's testimony as the trial court determined to be both probative and reliable.

## II.

Appellant Nichols next contends that the trial court abused its discretion in denying

24. *See Gannon v. State,* Del.Supr., 704 A.2d 272, 274 (1998)..

25. Del.Supr., 598 A.2d 1134 (1991).

26. *Id.* at 1140.

27. *Id.* at 1141.

28. The trial court also admitted Osborne's statement that Williamson fled the scene in a blue pickup truck.

his pre-trial motion to suppress "all items seized" from his motel room on the day of his arrest. Nichols further argues that his later incriminating statements to Detective Ford and others, made after his arrest, should have been suppressed as "fruit of the poisonous tree." Nichols raises his claims only under the Fourth Amendment of the Constitution of the United States and not under Article I, Section 6 of the Constitution of the State of Delaware or 11 *Del.C.* § 2301.[29]

Nichols argued at his suppression hearing that the police were prohibited from making a warrantless search of his motel room absent his consent or exigent circumstances. This was especially true, Nichols argued, because when the police first looked into the room, they saw a "black male" asleep on the bed, but the man they were looking for, Zecca, was white. Nichols argued that at this point, the police had no reason to suspect that Zecca was in the room. The court denied Nichols' motion by written Order after finding the evidence admissible under the plain view exception to the Fourth Amendment. We agree.[30]

■ The mere observation of an item in plain view does not constitute a Fourth Amendment search.[31] However, even if the item is contraband, the mere observation of an item in plain view generally does not permit its warrantless seizure. "The criteria that generally guide 'plain-view' seizures were [first] set forth in *Coolidge v. New Hampshire*...."[32] That case held that warrantless seizures of items in plain view are legitimate when (1) a law enforcement officer is lawfully in a position to observe the items, (2) the officer discovers the items inadvertently, and (3) the items' evidentiary value is immediately apparent.[33] Recently, in *Horton v. California*,[34] the United States Supreme Court modified this test and declared that "inadvertence ... is not a necessary condition" of a "legitimate 'plain-view' seizure[ ]."[35]

■ The trial court denied Nichols' motion after finding he failed to meet his burden under the *Coolidge* test. Because the element of inadvertence is no longer required under the Fourth Amendment, the court's finding on this element need not be reviewed. At the suppression hearing, the court considered several facts stipulated to by both parties. Two of these stipulated facts were that the police were present at the motel room to execute an active warrant for Zecca's arrest and that they had reliable information that Zecca might be in the room on the day of Nichols' arrest. The parties advanced conflicting arguments, however, as to what happened when the police arrived at Nichols' motel room door. The police contend the door was open approximately two inches when they arrived and that it opened further when they knocked on it and announced their presence. Nichols argued that the police broke in, but he presented no evidence to support his argument. The trial court stated: "there was no evidence presented that Defendant's door was closed at the time the Detectives approached it." Thus, the court concluded that the police were lawfully at the motel room door when they saw drugs and a gun in plain view, items of immediately ap-

---

29. The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const., amend. IV. The Fourth Amendment is made applicable to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

30. *See Nichols v. State*, Del.Supr., No. 212, 1997, Holland, J., 705 A.2d 244 (Dec. 24, 1997) (ORDER).

31. *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

32. *Horton*, 496 U.S. at 134, 110 S.Ct. at 2306, 110 L.Ed.2d at 121 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).

33. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–71, 91 S.Ct. 2022, 2037–41, 29 L.Ed.2d 564, 582–86 (1971).

34. 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

35. *Horton*, 496 U.S. at 130, 110 S.Ct. at 2304, 110 L.Ed.2d at 118–19.

parent evidentiary value.[36] Accordingly, we affirm the decision of the Superior Court and find no abuse of discretion in its denial of Nichols' Motion to Suppress.[37]

Nichols also challenges the admission of his statements to Detective Ford and others after his arrest as "fruit of the poisonous tree." [38] That issue, however, is rendered moot by our decision upholding the validity of the detectives' warrantless seizure.

## III.

Appellant Williamson next contends that the court violated his rights under the Confrontation Clause by denying him effective cross-examination of Zecca. In the alternative, Williamson argues that the court erred in refusing to admit Williamson's statements to two police officers. A trial court's ruling on the admissibility of evidence will be reversed only if it amounts to an abuse of discretion.[39]

When Zecca was arrested, he made a statement to the police. In the statement, he explained Williamson's account of what happened in the motel room. According to Zecca, Williamson said that "things got out of hand," and that "they got to fighting and cussing and beating each other up." On the day of the stabbing or the day after, Zecca repeated Williamson's account of the events to Nichols. When Nichols was arrested, he, too, made a statement to the police. In the statement, Nichols explained that Williamson told Zecca that Williamson and Osborne "got to fighting"; Osborne then "got the upper hand on [Williamson] and [Williamson] wound up pulling out the knife, stabbing [Osborne]."

Nichols opted not to testify at trial. The State introduced, through a police officer, the portion of Nichols' statement in which he admitted hiring Williamson to beat up Osborne as an admission against interest under

D.R.E. 804(3). The State did not introduce the statement that Osborne "got the upper hand" which might lead the jury to believe that the stabbing was committed in self-defense. The State did not introduce any portion of Zecca's statement to the police describing what happened in the motel room; Zecca testified live instead. During the State's case-in-chief, the State asked Zecca if, while at the Shoney's Inn, he "talked to Mr. Williamson about what happened?" Zecca stated that he did. The State then asked Zecca to repeat what Williamson said. Zecca gave a brief answer, but the State withdrew the question. The State asked again: "You talked about the incident?" Zecca answered: "Yes." Williamson argues that (1) he should have been allowed to cross-examine Zecca about what Williamson's told him or (2) that he should have been permitted to introduce Zecca's and Nichols' statements to the police because they tended to show that Williamson stabbed Osborne in self-defense.

### A. Zecca's Cross–Examination

On cross-examination, Zecca stated that he and Williamson did not discuss what happened in the motel room until roughly one hour after they had left the scene. Then, Zecca said, "it came out." Williamson's counsel asked: "What came out?" The State objected at this point and argued that the question was beyond the scope of direct examination. The State reminded the court that it had withdrawn its question on direct and had chosen not to inquire as to what Williamson told Zecca about what happened in the motel room. Williamson argued the withdrawal of the question should not prevent the court from finding that the State had raised the issue on direct. In the alternative, Williamson argued that the question was asked to explore Zecca's credibility. The court did not agree that the issue was raised on direct, and it sustained the State's objection stating:

---

**36.** A weapon may be "concealed" for purposes of establishing the elements of the crime of carrying a concealed deadly weapon and, at the same time, lie in "plain view" for purposes of search-and-seizure. *Robertson v. State*, Del.Supr., 704 A.2d 267 (1997).

**37.** *See also Nichols v. State*, Del.Supr., No. 212, 1997, Holland, J., 705 A.2d 244 (Dec. 24, 1997) (ORDER).

**38.** *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**39.** *Tice*, 624 A.2d at 401.

If you want to call him as your witness and you can do whatever you want to do. If he didn't go into it on direct then you have got to call him as your witness to get it in, that's cross-examination. You cannot do a direct in the State's case-in-chief.... You want to call him.

### B. Zecca's Direct Examination

During Williamson's case-in-chief, counsel asked Zecca to return to the stand and to repeat Williamson's account of what happened in the motel room. The State objected on the basis that the statement sought to be produced was hearsay. Williamson did not argue that the hearsay fell within any exception, but merely argued that the question went to Zecca's credibility. The trial court sustained the State's hearsay objection and explained to Williamson how to circumvent that objection:

[T]here's a way to cure that. And please don't misunderstand. I have no stake in whether your client takes the stand or not. I will protect his right to the hilt to not take the stand or to take it.

But if you're that bothered by the jury not knowing the whole story, then you and I both know there is a real easy way to cure that. But it's a two-edged sword. So you're not estopped from doing it. What you want to do is do it risk-free.

And I don't blame you for that, either, but unfortunately, the law requires some balance and equity, and the State is entitled to some protection too.

So ... if you give me a ground—You concede it's not an admission because you can't offer it. It's not a statement against interest under 804. If it's 803(24), you have to give notice, even if it met ... the rest of the conditions.

### C. Police Officer's Direct Examination

During Williamson's direct examination of one of the police officers, Williamson asked: "Did Mr. Nichols tell you there was a fight inside that hotel room?" The State objected on the basis that Nichols' statements to the police officer were hearsay within hearsay. Williamson argued that, under D.R.E. 106, the court was required, in fairness, to admit this remaining part of Nichols' statement because the State had offered a portion of the same statement during its case-in-chief. Williamson also argued, again, that the statement went to the witness' credibility. The trial court sustained the State's objection, noting that as to Nichols, the statement was an admission and was, therefore, admissible under D.R.E. 804(3). As to Williamson, however, the trial court explained that the statement contained multiple levels of hearsay. The court concluded: "You've got to find an exception. If you don't have an exception, the only way you can get it in is for your client to get on the stand and tell his version of what happened."

■ After a careful review of the record, we hold that the trial court did not abuse its discretion in refusing to permit Williamson to question Zecca about Williamson's description of the events in the motel room. The State avoided this area during Zecca's direct examination. The trial court also properly refused to admit the hearsay testimony of Zecca and the police officer. Williamson did not argue that Zecca's hearsay statement fell within any hearsay exception under D.R.E. 803, and although Williamson argued that Nichols' statement to the police officer was an excited utterance,[40] admissible under D.R.E. 803(2), Williamson did not argue that his statement to Nichols fell within any hearsay exception under D.R.E. 803.

■ We also find that the trial court did not abuse its discretion in implicitly rejecting Williamson's oft-repeated assertion that the hearsay statements should be admitted to test the witnesses' credibility. In *Weber v. State*,[41] we explained that the United States' Constitution guarantees a party's right to

---

40. We doubt any trial court could find Nichols' statement to be an excited utterance. Nichols was arrested on drug and drug-related charges, not for his involvement in the stabbing. Also, this statement was made during Nichols' second police interview, not while under the initial stress of his arrest. *See Gannon v. State*, Del. Supr., 704 A.2d 272, 274 (1998). Holland, J.

41. Del.Supr., 457 A.2d 674 (1983).

cross-examine for bias; the objective is to uncover any incentive a witness might have to testify falsely. In that case, we held that the trial court violated the defendant's rights by refusing to allow him to question witnesses about cash payments they had allegedly received from the victim's mother.[42] The testimony Williamson sought to introduce during Zecca's cross-examination, however, revealed nothing concerning a motive for Zecca to testify falsely. In fact, because Zecca's testimony would merely have been an iteration of what Williamson said, its admission would have put Williamson's credibility in issue, not Zecca's. The Sixth Amendment right to cross-examine for bias has no applicability to Williamson's direct examination of Zecca or the police officer, and Williamson's credibility arguments at the direct examination stage were properly rejected by the trial court.

■ Williamson argues that because the State offered a portion of Zecca's statement to the police and a portion of Nichols' statement to the police, the trial court was required, in fairness, to admit Williamson's proffer of the remaining portions of those statements under D.R.E. 106. That rule states:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Whether fairness requires the admission of the remainder of or a related written or recorded statement under D.R.E. 106 is left to the sound discretion of the trial court.[43]

■ We find no abuse of discretion in the trial court's refusal to admit the remainder of Zecca's and Nichols' statements to the police. Under D.R.E. 403, the statements' probative value was outweighed by the potential prejudice to the State. The statements, both iterations of Williamson's self-serving description

of the events in the motel room, would have put Williamson's credibility in issue. Because he chose not to testify, however, the State would have been unable to test Williamson's credibility through cross-examination. Although the trial court did not explicitly mention D.R.E. 403, the portions of the trial transcript reproduced above reveal that the trial court's focus was correct: the court prevented Williamson from admitting his self-serving statements, offered for their truth, where the State would have been unable to test Williamson's credibility. Admitting the additional portions of the statements given by Zecca and Nichols would not have tested their credibility in any meaningful way.

■ Finally, Williamson argues that in refusing to allow his cross-examination of Zecca and in repeating several times that Williamson had the right to testify, the trial court unfairly tried to force Williamson to testify. We find no merit in Williamson's argument. The trial court merely stated a fact under the law: that the statements sought to be admitted were beyond the scope of the State's direct examination of Zecca or were hearsay that could not be admitted unless they fell within an exception to D.R.E. 802. If Williamson were to testify, however, his hearsay statement to Zecca would have been admissible under 11 *Del.C.* § 3507 and may have been admissible as non-hearsay under D.R.E. 801(d)(1)(B) if offered to rebut a charge of recent fabrication.

## IV.

■ Williamson contends that the trial court abused its discretion by refusing to give the appellants a total of ten peremptory challenges and that the court's rulings concerning peremptory challenges were unfairly partial to the State. At the outset of jury selection, the court granted the State eight peremptory challenges, and it granted the defendants ten, or five each. After the parties questioned the feasibility of proceeding with an uneven number of challenges on

42. *Weber,* 457 A.2d at 682–83.

43. *Burke v. State,* Del.Supr., 484 A.2d 490, 497 (1984) (also holding that the written or recorded statement itself need not be introduced for

D.R.E. 106 to apply; a party may seek to use the rule to supplement oral testimony about a written or recorded statement).

opposing sides and discussed the matter with the trial court, the court decided that the State would also be granted ten peremptory challenges. After the initial colloquy with the members of the venire, during which a number of potential jurors were excused, the court realized that if each party were to exercise all of its challenges, there would be an insufficient number of veniremen remaining to constitute a jury. After discussion, and over the defendants' objection, the trial court reduced the number of peremptory challenges from ten to eight per side. The defendants exercised all of their challenges. When it became clear that the State would use no more than two of its challenges, the defendants asked the trial court to grant them two additional challenges, or one each, to restore the total per defendant to five. The trial court refused. We hold that the trial court did not abuse its discretion by refusing to grant the appellants ten peremptory challenges and that, in reaching its decision, the trial court was not unfairly partial to the State.

Superior Court Criminal Rule 24(b)(1) states: "In noncapital cases, the state shall be entitled to 6 peremptory challenges and the defendant or defendants shall be entitled to a total of 6 peremptory challenges." [44] The court may grant additional peremptory challenges in its discretion. [45] The trial court complied with the requirements of Rule 24 and, in its discretion, granted each defendant one extra challenge. Nevertheless, Williamson argues that the court should not have reduced the number of challenges granted from ten to eight merely because there may have been too few prospective jurors in the venire. This Court, however, has held that the number of jurors in a venire may be considered by a trial court when it determines the number of peremptory challenges it will award. [46] That the low number of jurors on the venire was not discovered until the questioning of the venire had begun does

not change our analysis. The trial court's decision not to grant the appellants two extra challenges was based on considerations of fairness, orderliness and efficiency. The trial court did not abuse its discretion, and Williamson did not show how the exercise of discretion conferred an unfair benefit upon the State.

## V.

Williamson next contends that the consecutive sentences imposed for his convictions violate his rights against double jeopardy. This Court reviews *de novo* claims alleging the infringement of a constitutionally protected right. [47] Williamson argues that the offenses of attempted extortion and second degree conspiracy to commit the crime of extortion should merge into assault first degree because they were the product of "one continuous act," or a single instance of criminal conduct. Williamson cites no authority for this proposition, nor could he. "The key question presented by a claim of double jeopardy that is based on multiple punishments is: did the General Assembly intend to impose more than one punishment for a single occurrence of criminal conduct." [48] In addition, 11 *Del.C.* § 206(a) states: "When the same conduct of a defendant may establish the commission of more than 1 offense, the defendant may be prosecuted for each offense." That statute goes on to state that the defendant may not be convicted of more than one offense, however, if one offense is included in the other. Section 206(b) defines an included offense as one that "is established by the proof of the same or less than all the facts required to establish the commission of the offense charged."

The text of the statutes under which Williamson was convicted clearly demonstrates that conspiracy, extortion and assault contain different elements of culpability for

---

44. Super.Ct.Crim.R. 24(b)(1).

45. Super.Ct.Crim.R. 24(b)(2); *see Hickman v. State*, Del.Supr., 431 A.2d 1249, 1251 (1981) (construing language of Rule 24 in capital case).

46. *Ward v. State*, Del.Supr., Nos. 137, 1990, 154, 1990, 156, 1990, Horsey, J., 602 A.2d 1082 (Sept.

9, 1991), Order at 4 (citing *United States v. Garza*, 664 F.2d 135 (7th Cir.1981)).

47. *Stigars*, 674 A.2d at 481.

48. *Id.*

which the General Assembly intends separate punishments even if the offenses arise out of the same conduct. The text of the statutes also reveals that none of the offenses at issue is included in the others; each requires proof of at least one element that is not required to prove the others. A unique element of conspiracy in the second degree is agreement with another person.[49] A unique element of extortion is instilling fear,[50] and a unique element of assault in the first degree is serious physical injury.[51] The separate sentences did not place Williamson in double jeopardy.

 Williamson also argues that the two counts of possession of a deadly weapon during the commission of a felony should merge because he used only one knife. This argument fails under 11 *Del.C.* § 1447 and this Court's holding in *Robertson v. State*,[52] where we construed that statute and stated: "separate convictions for a deadly weapon offense, for each felony the defendant committed while in possession of a deadly weapon, is consistent with the deterrence goal of the statute and ... such multiple weapon convictions [are] supported by the statute's plain language." [53] The two sentences do not subject Williamson to double punishment for the same offense.

## VI.

 Finally, Williamson states: "There is no testimony as to [whether] the weapon was in the Appellant's possession when he allegedly committed attempted extortion. There [was] no testimony that he entered the motel room with the knife." Although this argument was made as part of Williamson's merger of offenses argument, we infer from this statement that Williamson raises an independent argument challenging the sufficiency of the evidence upon which the jury found that he possessed the knife during his attempted extortion of Osborne. The standard of review for a claim of insufficient evidence is whether " 'any rational trier of fact, viewing the evidence in the light most favorable to the State could find the defendant guilty beyond a reasonable doubt.' " [54]

 The jury heard evidence that Williamson went to Osborne's room to collect a debt on Nichols' behalf. Zecca testified that he inferred from Williamson's conversation with Nichols that the attempt to collect the money could lead to violence and that Williamson was in possession of a knife when he left Osborne's motel room. Finally, the jury fairly concluded that Williamson stabbed Osborne during their meeting. Given this and other evidence, we hold there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that Williamson possessed the knife during his attempt to extort money from Osborne.

\*     \*     \*     \*     \*     \*

Accordingly, the appellants' convictions and sentences are affirmed.

---

49. 11 *Del.C.* § 512.

50. 11 *Del.C.* § 846.

51. 11 *Del.C.* § 613.

52. Del.Supr., 630 A.2d 1084 (1993).

53. *See Robertson*, 630 A.2d at 1093 (citing *Pauls v. State*, Del.Supr., 554 A.2d 1125 (1989)).

54. *Fennell v. State*, Del.Supr., 691 A.2d 624, 627 (1997) (quoting *Robertson v. State*, Del.Supr., 596 A.2d 1345, 1355 (1991)).