**STATE of Delaware, Plaintiff Below, Appellant.**

v.

**Steven L. HENDERSON, Defendant Below, Appellee.**

No. 114, 2005.

Supreme Court of Delaware.

Submitted: Dec. 7, 2005.

Decided: Jan. 18, 2006.

Elizabeth R. McFarlan, Department of Justice, Wilmington, DE, for appellant.

Joseph A. Hurley, Wilmington, DE, for appellee.

Before, STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice, for the majority:

In January 2004, the police decided to execute an arrest warrant for Michael Jones at a local Boys and Girls Club recreation center. When they executed the warrant, the police detained and performed a *Terry* pat-down of Steven Henderson. The Henderson's pat-down resulted in the discovery of a gun. A Superior Court judge, unable to find any legal justification for the pat-down, granted Henderson's motion to suppress the gun found. In this appeal, the State has urged this Court to determine that the officer had a reasonable articulable suspicion to stop and frisk Henderson based on the "totality of the circumstances," or, in the alternative, that the gun was within the "plain view" of the officer when the officer seized the weapon.

We conclude that because Henderson merely left a recreation center with Michael Jones, a wanted fugitive, and fully cooperated with police when stopped, the police officer lacked the reasonable articulable suspicion required for a valid pat-down—i.e., the suspicion that Henderson was armed and presently dangerous. Fur-

ther, although the State argues that the plain view doctrine applies, it failed to meet its burden to show that Schiavi, in fact, saw the gun before or as he performed the pat-down. Accordingly, we affirm the judgment of dismissal by the Superior Court.

I.

On January 25, 2004, the Delaware State Police received information that Michael Jones, a fugitive wanted pursuant to a DEA warrant for felony drug charges, would be playing basketball at a Boys and Girls Club in New Castle County. The police made a decision to arrest Jones at the recreation center.

After a briefing at which Jones' description was made available, the police assembled a "take-down" team of five or six police officers in the recreation center parking lot. Edward Schiavi was among the officers assigned to the "take down" team. The team arrived between 11 a.m. and 12 p.m. and waited for Jones to leave the recreation center.

Schiavi, after waiting in the parking lot for two hours, received a call that a member of the "team" saw Jones leaving the building with two other unidentified men. Jones, together with a man later identified as Steven Henderson, and another companion, were seen walking toward an SUV in the parking lot. Claiming he did not know which man was Jones,[1] Schiavi pulled his police car in front of the SUV, announced his presence, and instructed the driver, later identified as Henderson, to place his hands on the vehicle. Henderson immediately dropped the bag he was car-

---

1. The officer claimed that he was unable to determine the identity of Jones despite a briefing prior to the arrest where he was given a description and might even have been shown a photograph of Jones. Further, he claimed that when he received the radio call, the detective on the other end did not say which person was Jones, but only said "there is a group of four males coming out the door and I believe Jones is one of them."

rying and placed his hands on the vehicle. According to Schiavi, the following occurred:

> I exited my vehicle. As Mr. Henderson was putting his hands on the hood of his car in front of the driver's side, I then approached him from the rear to conduct a pat-down for weapons and identification. At that time, I had my left hand on the—on his left, I guess, shoulder blade, and my right had came around to his waist area. Mr. Henderson is a little taller than I am, so my eye level was just probably just at his shoulder or right arm. As soon as my right hand made contact with his clothing, his—he was wearing, like, a three-quarter-length dark jacket, my hand went on to what I can only describe as the feeling of a gun. As my eyes looked down at my hand, I could see the butt of a gun in his pocket.

Schiavi then arrested Henderson. The State charged Henderson with Receiving A Stolen Firearm and Carrying A Concealed Deadly Weapon.

Before trial in the Superior Court, Henderson moved to suppress the gun on the basis that the search was unreasonable under the Delaware and United States Constitutions. The trial judge found that the usual basis for seizing and conducting a pat-down—a reasonable articulable suspicion under the totality of the circumstances—to be absent. The trial judge further held that the only potential basis for finding the search reasonable, the so-called "automatic companion rule," was in violation of the Delaware Constitution. Thus, the trial judge granted the Motion to Suppress and the State dismissed the charges.

The State now appeals, claiming that under the "totality of the circumstances" the "pat-down" was reasonable, or, in the alternative, that the seizure of the gun was valid because it was within the plain view of the officer. We are not asked to, and therefore we do not, rule on the constitutionality of the "automatic companion rule." The trial judge's determination of whether the police possessed reasonable articulable suspicion to stop and frisk Henderson and then seize the weapon found is a mixed question of law and fact that this Court reviews *de novo*.[2]

## II.

 Under the Fourth Amendment of the United States Constitution, police officers may stop an individual for investigatory purposes if the officer has a "reasonable articulable suspicion to believe that the individual to be detained is committing, has committed, or is about to commit a crime."[3] Further, a police officer may frisk a person who has been detained if he possesses a reasonable articulable suspicion that the detainee is armed and presently dangerous.[4] The United States Supreme Court has defined reasonable suspicion as the officer's ability to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion."[5] In determining whether reasonable articulable suspicion exists, a court "must examine the totality of the circumstances surrounding the situation as

---

**2.** *Jones v. State,* 745 A.2d 856, 860 (Del.1999) (*citing State v. Maxwell,* 624 A.2d 926, 928 (1993)).

**3.** *Woody v. State,* 765 A.2d 1257, 1262 (Del. 2001) (*citing Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

**4.** See *Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

**5.** *Coleman v. State,* 562 A.2d 1171, 1174 (Del. 1989) (*citing Terry,* 392 U.S. at 21, 88 S.Ct. 1868).

viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts." [6] With these principles in mind, we examine whether, under the totality of the circumstances, the police possessed a reasonable articulable suspicion to stop and frisk Henderson.

### III.

■ Here, the original stop of Henderson was valid. Schiavi received a radio call indicating that Jones, a person wanted on felony drug charges, was one of the three men exiting the recreation center, which provided Schiavi with the necessary reasonable articulable suspicion to stop the men to determine their identity.

The frisk of Henderson, however, was not supported by a reasonable articulable suspicion that Henderson was armed and dangerous. The State relies on *Hunter v. State* [7] to support its claim that the frisk was valid. In *Hunter*, this Court addressed a situation where the companion of a drug dealer was frisked for weapons. [8] The Court held that Hunter's frisk of a companion of a person wanted for drug trafficking pursuant to a warrant was valid, because under the totality of the circumstances, the officer reasonably "believed it was necessary to pat down Hunter for the protection of himself." [9] There, however, the officer was outnumbered two to one in a crowded restaurant and saw Hunter reach for his pocket after Hunter was instructed to place his hands on the wall. [10] Further, the officer, using the least intrusive means to protect himself, limited his pat down to the pocket to which Hunter had made a "furtive" move.

Here, Schiavi did not have reasonable suspicion that Henderson was armed and presently dangerous. The frisk occurred during midday and in an area not known for high drug activity. What the State has called a police "take-down team" outnumbered the suspects five to three. Moreover, Schiavi had "blocked in" the vehicle that the three men approached, and instructed Henderson to place his hands on the vehicle, which he did. Unlike the defendant in *Hunter*, at no time did Henderson move his hands from the vehicle or become uncooperative in any fashion. [11]

6. *Jones v. State*, 745 A.2d 856, 861 (Del.1999) (*citing United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); *accord Quarles v. State*, 696 A.2d 1334, 1337 (Del.1997).

7. 783 A.2d 558 (Del.2001).

8. 783 A.2d 558 (Del.2001).

9. *Id.* at 562.

10. *Id.*

11. The officer's testimony further indicates the lack of specific articulable facts that Henderson was armed and presently dangerous. The officer testified as follows:

Q. There's nothing in his appearance, if he was walking out of there without being in the company of Jones, that, notwithstanding your 15 years as a police officer, would have made you think this guy could be dangerous?
A. That's correct.
Q. Okay. There was nothing about the way that he walked across the parking lot toward his vehicle that made you isolate on him, "That guy could be dangerous"?
A. That's correct.
Q. When you pulled up in front of his vehicle, designed to keep him from—his vehicle from moving, and you held up your ID and your badge, identified yourself as a police officer, there was nothing that he did to suggest alarm, concern on his part at your presence.
A. I think he was shocked to see that we were the police.
Q. Which you'd expect anybody to do that, wouldn't you?

The State suggests, however, that the officer had reason to fear for his safety because "drug traffickers often protect their assets and their supply with weapons and associates." Applied here, this argument is, however, flawed. At the time of the stop, the police had no information suggesting that Henderson was anything more than a basketball acquaintance of Jones. The police never before witnessed Henderson in the presence of Jones in any other situation, and therefore could not reasonably conclude that Henderson was connected to Jones's alleged drug business. We cannot hold that simply accompanying another person reasonably suspected of having committed felony drug charges, without anything more gives rise to a reasonable articulable suspicion that the companion is presently armed and dangerous.

## IV.

■ The State has also argued, in the alternative, that the gun is admissible because the officer first discovered the gun in "plain view." The plain view doctrine is an exception to the Fourth Amendment's warrant requirement for searches and seizures.[12] Under that doctrine, "the mere observation of an item in plain view does not constitute a Fourth Amendment search."[13] The State bears the burden to show that the discovery of the gun resulted from Officer Schiavi's mere observation.[14]

■ The trial judge made the factual finding that it was "unclear whether the first sensation of the gun was by feel or sight, but whichever was first, the other followed almost immediately."[15] This Court reviews the trial court's factual findings in granting of a motion to suppress, after an evidentiary hearing, under an abuse of discretion standard.[16] The trial judge's decision can be reversed only if this court finds the decision below to be clearly erroneous.[17]

Applying these standards, we conclude the trial judge's finding that it was unclear whether the officer saw the gun first to be

A. Right.

Q. Other than shock or surprise at your arrival, there was nothing that you saw in the way he reacted or responded to your presence that made you think that he was threatening?

A. No.

Q. Okay. And you immediately ordered him to put his hands on the hood of his car. What did he do?

A. He put his hands on the hood of the car.

Q. He had a bag, which I think you said you remember some kind of bag in his hand. Did he put the bag down on the ground before touching the hood of the car?

A. Yes.

Q. So, he was completely obedient to the commands that you gave?

A. That's correct.

12. See Williamson v. State, 707 A.2d 350, 358 (Del.1998) (citing Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)).

13. Id.

14. See Hunter, 783 A.2d at 560 (stating that the State bears the burden of proof on a motion to suppress evidence seized during a warrantless search).

15. State v. Henderson, 2005 WL 388268 at *2, 2005 Del.Super. Lexis 40 at *5 (Del.Super.2005).

16. See Woody v. State, 765 A.2d 1257, 1261 (Del.2001) (stating "[t]he appellate court reviews the trial court's refusal to grant a motion to suppress evidence under an abuse of discretion standard. Thus, a conviction can be reversed only if the appellate court finds the trial court's decision to be clearly erroneous.").

17. Id.

a fair interpretation of the testimony. The officer's vague testimony indicates that whether he saw or felt the weapon first was unclear at best.[18] At oral argument before this Court, the State took the position that the officer "felt the gun, then looked down and saw it." Thus, the trial judge's factual finding supports the conclusion that the State failed to meet its burden to prove that Officer Schiavi first saw the weapon in "plain view."

### V.

For these reasons, the judgment of the Superior Court is **AFFIRMED**.

BERGER, Justice, dissenting:

The majority holds that Schiavi did not have a reasonable articulable suspicion that Henderson might have been armed and dangerous. It points out that the stop took place in the daytime, in a place not known for drug activity. In addition, the police had no information that Henderson was associated with drug dealing, Henderson obeyed the officer's commands, and the police officers outnumbered the suspects five to three. The majority concludes, "we cannot hold that simply accompanying another person reasonably suspected of having committed felony drug charges, without anything more, gives rise to a reasonable articulable suspicion that the companion is presently armed and dangerous."

In reaching its conclusion, the majority ignores almost all of Schiavi's undisputed testimony. Schiavi testified that he has made approximately 260 narcotics-related arrests. In his experience, "drug traffickers often protect their assets and their supply with weapons and associates. And they also have their plans in place to prevent from being apprehended ...[a]nd we wanted to take all means necessary to

---

18. The officer's testified on cross examination as follows:

Q: And, then, I think I quoted you, "As my eyes looked down, as soon as my right hand made contact, I had a feeling of the butt of a gun as my eyes looked down"—I had the feeling of a gun. As my eyes looked down, I saw the butt of a gun." Is that a fair statement?

A: Yes.

Q: Okay. So, the first thing in sequence that happens is that your hand actually *touches the pocket which alerts you to* something dangerous there, and, immediately, you look down and see the butt of a gun?

A: It was pretty much simultaneous.

Q: Pretty much. But you can't say positively it was identically simultaneous because what you said here was "touched, my eyes looked down," didn't you?

A: The point I am trying to get across is that, as my hand's going on it and my eyes are looking at it, the feeling recognition and the visual recognition are almost simultaneously.

Q: Almost, but you can't say perfectly?

A: Can't say perfectly.

Q: When you told us the story, you didn't say—when I say story, I'm not suggesting you're making it up. You didn't say, "My eyes looked down, and, then, I touched it." You talked about the touching and, then, your eyes looking down, didn't you, as you told it chronologically?

A: That's right.

Further confusion is added when the officer testifies:

Q: That's not your procedure?

A: Yeah, my procedure, personally, an officer making an arrest is, I want to secure and make sure the person is not going to put up any active resistance until I feel safe to ask questions, look for identification, anything like that. And the first thing I did with Mr. Henderson is feel the gun.

Q: Okay. And you just said then, "The first thing I did with Mr. Henderson was feel the gun," didn't you.

A: Right.

Q: You didn't say, "The first thing I did with Mr. Henderson was see the gun"?

A: Right.

safely execute our warrant and to see that the individuals with Mr. Jones were also kept from any unnecessary force or violence that could occur with executing the warrant." [19] Schiavi also explained that drug dealers and their associates remain dangerous even when engaged in seemingly harmless activities, like playing basketball:

> Q. And you would agree with me that even drug dealers take time off from their dealings, their work, and engage in recreational activities where there's no activity going on that's related to drugs?
> A. I can't answer that a hundred percent. I mean, I don't—I
> Q. You've never done surveillance and seen drug dealers go to the movies and do things?
> A. Yes, I've done surveillance and have seen them—I've also seen them during the course of what you would say, go to the movies, conduct drug transactions as well. [20]

Finally, Schiavi explained that his procedure, when making an arrest is "I want to secure and make sure the person is not going to put up any active resistance until I feel safe to ask questions, look for identification, anything like that." [21]

The State satisfied its burden of showing that Schiavi had a reasonable articulable suspicion that Henderson was armed. Schiavi knew that Henderson either was the drug dealer (Jones) or an associate of a drug dealer. From his experience, he knew that drug dealers and their associates tend to be armed. He also explained that, when effecting an arrest, there is a danger that the person being arrested, or his associates, will resist. Even with other officers present and the vehicle blocked, the arrest could have become violent if one or more of the people being detained had a weapon.

In sum, Schiavi was "warranted in the belief that his safety or that of others was in danger." [22] He properly acted "in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts." [23] Accordingly, I dissent.

---

19. Appendix, A–9.

20. Appendix, A–11.

21. Appendix, A14.

22. *Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

