# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PARAMOUNT GLOBAL, | § | |
| | § | |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | No. 129, 2025 |
| | § | |
| STATE OF RHODE ISLAND | § | Court Below: Court of Chancery |
| OFFICE OF THE GENERAL | § | of the State of Delaware |
| TREASURER, ON BEHALF OF | § | |
| THE EMPLOYEES' RETIREMENT | § | C.A. No. 2024-0457 |
| SYSTEM OF RHODE ISLAND, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: November 12, 2025
Decided: March 25, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **AFFIRMED and REMANDED.**

Jon E. Abramczyk, Esquire, D. McKinley Measley, Esquire, Alexandra M. Cumings, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jonathan K. Youngwood, Esquire (*argued*), Meredith Karp, Esquire, SIMPSON THACHER & BARTLETT LLP, New York, New York *for Defendant Below, Appellant Paramount Global.*

Corinne Elise Amato, Esquire, Eric J. Juray, Esquire (*argued*), Stacey A. Greenspan, Esquire, Seth T. Ford, Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Lee D. Rudy, Esquire, Eric L. Zagar, Esquire, Grant D. Goodhart, Esquire, Michael W. McCutcheon, Esquire, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania *for Plaintiff Below, Appellee State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island.*

**TRAYNOR**, Justice, for the Majority:

Shari Redstone controlled National Amusements Incorporated. National Amusements owned a majority of the voting shares of Paramount Global ("Paramount"). So, Redstone, through her control of National Amusements, controlled Paramount. In 2023, Redstone considered selling National Amusements. Newspapers—citing confidential and unnamed sources close to the negotiations—reported on the various offers that Redstone fielded and how Redstone and Paramount reacted to and engaged with the interested bidders. Some articles suggested that Redstone, in her capacity as controller of Paramount, blocked a sale of Paramount in its entirety in favor of a sale of just National Amusements' controlling interest in Paramount.

The Employees' Retirement System of Rhode Island ("Rhode Island"), a Paramount stockholder, served a demand to inspect books and records under Section 220 of the Delaware General Corporation Law on Paramount. The demand sought documents related to the developing sale. Paramount rejected this demand, prompting Rhode Island to file a complaint seeking a court order compelling inspection. In its complaint, Rhode Island alleged that it had a proper purpose for its inspection: a credible basis from which the court could infer both the usurpation of Paramount's opportunity to sell itself and breaches of fiduciary duties by Redstone and National Amusements. After service of the demand, but before the books-and-

2

records trial took place, newspapers published additional articles reporting on new transaction-related developments, and Paramount made SEC filings that partially confirmed the prior reporting. At trial before a Magistrate in Chancery, the stockholder sought to introduce, and the Magistrate declined to consider, this post-demand evidence. In so concluding, the court held that the stockholder was required to have a credible basis to infer wrongdoing at the time of its demand and thus the stockholder could rely only on evidence that existed when the demand was made. The Magistrate's report found no credible basis to suspect wrongdoing and recommended entry of judgment for Paramount. Rhode Island took exceptions to the report.

The Vice Chancellor, after conducting a *de novo* review of both the facts and the law, chose not to adopt the Magistrate's recommendation. After considering the evidence, including the post-demand evidence and the confidentially sourced news articles, the court found that Rhode Island had shown by a preponderance of the evidence that it had a credible basis to infer corporate wrongdoing and was therefore entitled to the inspection of books and records necessary and sufficient to serve its purpose. The court ordered the matter remanded to the Magistrate for a hearing on the scope of production.

Paramount asked the Vice Chancellor to certify two aspects of the court's decision for interlocutory appeal to this Court. The Vice Chancellor granted

3

Paramount's request, and we accepted the appeal. In this opinion, we conclude that the Vice Chancellor did not err by considering the post-demand evidence and the confidentially sourced news reports. More detailed background and the reasons for our decision follow.

I

A

The parties agreed to a trial on a paper record comprising seventy-seven exhibits from which we summarize the relevant facts.

Paramount Global, a Delaware corporation, owned Paramount Pictures, CBS Television Network, and other streaming services, cable networks, and media assets. Paramount's Class A shares carried voting rights, its Class B shares did not. Shari Redstone controlled Paramount through her control of National Amusements, Inc., which owned a supermajority of Paramount's voting Class A shares.

In May 2023, Paramount's board of directors, facing financial pressure, cut Paramount's dividend by nearly 80%. At the end of May 2023, a *Wall Street Journal* story reported that National Amusements received a $125 million investment, a much-needed cash infusion allowing it to keep up with loan payments without having to sell Paramount shares. The article also reported that Paramount's (now-reduced) dividend accounted for National Amusements' main source of revenue and, correspondingly, Shari Redstone's main source of personal income. The *New York*

4

*Times* reported later that year that National Amusements continued to struggle to make loan interest payments and might have to consider a sale.

A December 2023 *Wall Street Journal* story reported that Redstone was discussing a sale of National Amusements with Amazon, Apple, Netflix, and Skydance Media. The *New York Post* reported at the beginning of the following year that Redstone had put National Amusements up for sale, seeking a 50% premium for its controlling block of Class A Paramount shares. According to the *New York Post*, Redstone sought a quick deal because National Amusements faced an upcoming $37.5 million interest payment. That same day, the *Wall Street Journal* reported that Skydance was preparing an all-cash bid for Paramount and might be able to pay more than a private equity firm because of expected synergies between Skydance and Paramount.

On January 31, 2024, the *Wall Street Journal* reported that entertainment executive Byron Allen had bid $14.3 billion for Paramount, an offer which included a 32.75% premium for Class A shares holding voting rights. The price of both share classes rose. The *New York Post* reported that Skydance and Redstone were close to reaching a price for National Amusements and that Paramount's Board had formed a special committee to evaluate the various acquisition proposals. A Paramount press release confirmed the committee's creation.

On February 16, *Bloomberg Law* reported that, according to "more than a dozen interviews with people involved in the process" and "[e]xecutives close to the negotiations[,]" Redstone, after years of refusing to discuss a sale of National Amusements, had begun to seriously consider the idea.[1] The *Wall Street Journal* reported on March 20 that, "according to people familiar with the situation," Apollo Global Management had offered to buy Paramount Studios for $11 billion.[2] Paramount's share price increased by 12% following the news of Apollo's bid. The *Financial Times* then reported that Redstone had rejected Apollo's offer in favor of the budding Skydance deal. It cited "two people briefed on the matter" with "direct knowledge" of the developments.[3]

An April 3 *Variety* story reported that the special committee had rejected Apollo's studio-only bid and that Apollo had subsequently offered $27 billion for the whole company, an offer that the special committee refused to consider. The *Variety* article referenced as sources "people familiar with the matter[,]" including "[p]eople close to the Apollo bid."[4] The article noted that it was "not clear why the company's special committee would not have considered Apollo's $27 billion bid

---

[1] App. to Opening Br. at A499–509.
[2] *Id.* at A510–12.
[3] *Id.* at A515–15.
[4] *Id.* at A518–19.

for the entire company."[5]   The *Wall Street Journal* reported that the Board had agreed to exclusive discussions with Skydance.

B

These were the facts known to Rhode Island, a holder of Paramount Class B common stock, when on April 5, 2024, it served Paramount with a books-and-records demand under 8 *Del. C.* § 220.   The demand expressed Rhode Island's concern that "Shari Redstone and National Amusements have used third parties' interest in acquiring some or all of Paramount to usurp Paramount's corporate opportunity by marketing National Amusements to buyers who otherwise would be interested in Paramount or its assets."[6]   The demand continued: "the Paramount Board has done nothing to ensure that Redstone is not diverting corporate opportunities or interfering with Paramount's ability to seek the best deal for Paramount and its other stockholders."[7]

The April 5 demand sought materials relating to (i) any actual, potential, or proposed sale, merger, or other business combination involving National Amusements, Paramount, or any of Paramount's assets, (ii) any committee of the Board empowered to evaluate such a transaction, and (iii) the adoption of change-in-control agreements for Paramount management.   The demand also sought

---

[5] *Id.*
[6] App. to Answering Br. at B87–89.
[7] *Id.*

informal electronic communications, specifically the emails and text messages of Redstone and her advisors throughout the dealmaking process. The demand relied largely on the public reporting set forth above.

On the same day as Rhode Island's demand, the *Wall Street Journal* reported that, according to "people familiar with the situation," Skydance would acquire National Amusements for $2 billion in cash and Paramount would acquire Skydance in exchange for $5 billion in stock.[8] Days later, the *Journal*, citing "people familiar with the situation," reported that four Paramount board members, three of whom were members of the special committee, would step down.[9] The article attributed at least one of the departures to concerns about the Skydance transaction. On April 22, Paramount confirmed the directors' departure in an SEC filing. In another article published soon after the departures, the *Wall Street Journal* reported that according to "people familiar with the situation," Paramount's board was preparing to fire Paramount CEO Robert Bakish because Bakish was at odds with Redstone and considering alternatives to the Skydance deal. On April 29, the Paramount Board announced Bakish's removal and the promotion of multiple executives to co-CEO

---

[8] App. to Opening Br. at A522.
[9] *Id.* at A526.

roles.[10]  A *Financial Times* story cited a source "familiar with the matter[,]" who concluded that Bakish had been "uncooperative" and clashed with Redstone.[11]

C

On April 19, 2024, Paramount responded to Rhode Island's demand, asserting that the demand had failed to state a proper purpose: "there could be no usurpation of Paramount's business opportunities because there was no agreement to sell Paramount as of the time the demand was made."[12]  In rejecting the demand, Paramount offered to produce board resolutions addressing the creation of the special committee and its mandate to evaluate proposed transactions.[13]  Paramount also offered to re-engage with Rhode Island regarding the demand at a later point, should a transaction ever take place.  On April 30, Rhode Island filed its § 220 complaint in the Court of Chancery before the transaction with Skydance was announced.[14]  The media coverage continued.

On May 2, the *Wall Street Journal* reported that, according to people "familiar with the situation," Apollo and Sony had submitted a joint offer letter to acquire Paramount for $26 billion.[15]  The following month, the *Journal* reported that Skydance had improved its offer for Class B shareholders, offering a 26% premium

---

[10] *Id.* at A542–47.
[11] *Id.* at A538–41.
[12] Opening Br. at 7–8.
[13] App. to Opening Br. at A76.
[14] *Id.* at A158–60.
[15] *Id.* at A601.

for Class B shares but approximately $300 million less for National Amusements' Class A shares. On June 12, the *Los Angeles Times*, citing "seven people close to the situation who were not authorized to comment on internal discussions," reported that the combination of the decrease in consideration for Redstone and Skydance's refusal to indemnify her from lawsuits arising from the transaction caused Redstone to walk from the deal.[16] The *Wall Street Journal* printed a similar story the following day.

On July 2, the *Wall Street Journal* reported that, according to "people familiar with the matter," Paramount and Skydance had reached a new agreement, under which Skydance would purchase National Amusements for $1.75 billion.[17] On July 7, Paramount announced the proposed merger.[18] Skydance would buy National Amusements for $2.4 billion in cash and then merge with Paramount, valuing Skydance at $4.75 billion. Skydance equity holders would receive 317 million Paramount Class B shares valued at $15 per share and would be the sole remaining owners of Paramount's Class A voting shares. The new company would indemnify Redstone from litigation arising from the transaction. *Barron's* described the deal as, "National Amusements gets cashed out at a nice price, but the deal for public

[16] *Id.* at A615.
[17] *Id.* at A624–28.
[18] App. to Answering Br. at B290–91.

holders of the nonvoting stock is much less generous and most of any upside will go to Skydance."[19]

## D

On July 24, a Magistrate in Chancery held a trial on a paper record. To establish that it had a credible basis to suspect wrongdoing, Rhode Island relied primarily on the reporting outlined above, presenting over a dozen pre-demand articles outlining the transaction's development. It also relied on post-demand articles addressing post-demand events and post-demand securities filings that corroborated the pre-and-post-demand reporting.[20] On August 2, the Magistrate issued a post-trial final report, finding that Rhode Island lacked a proper purpose for its demand. The final report explained that the court could "only consider the evidence available at the time the demand was served."[21] Rhode Island took exceptions to the Magistrate's report.

In October 2024, Rhode Island served a second demand on Paramount while review of its exceptions was pending before the Court of Chancery.[22] The second demand did not seek the emails and text messages of Redstone and her advisors sought in the first demand.[23]

---

[19] App. to Opening Br. at A629–34.
[20] *Id.* at A37, A114, A357–58.
[21] *Id.* at A395.
[22] *Id.* at A548–600.
[23] *Id.* at A50–51, A642–72.

When a litigant takes exceptions from a Magistrate in Chancery's report, the Court of Chancery reviews the Magistrate's findings—both actual and legal—*de novo*.[24] After conducting such a review, the Vice Chancellor in a January 29, 2025 Opinion Addressing Stockholder's Proper Purpose (the "Proper Purpose Decision") declined to accept the Magistrate's recommendation, holding that "there are settings when a stockholder can legitimately rely at trial on post-demand evidence."[25] As to Rhode Island's use of confidentially sourced reporting, the Vice Chancellor held that "articles from reputable publications that rely on anonymous sources will generally be sufficiently reliable for a court to consider when assessing" the existence of a "credible basis to suspect wrongdoing."[26] The court concluded that the demand demonstrated a credible basis to suspect that Redstone and National Amusements had breached the duty of loyalty "by channeling potential buyers away from a Company-level transaction and into an NAI-level transaction."[27] The Vice Chancellor remanded the matter to the Magistrate to determine the scope of production.

---

[24] *Hauppauge Digital, Inc. v. Rivest*, 300 A.3d 1270, 2023 WL 4440279, at *5 (Del. July 10, 2023) (TABLE) (citing *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999)).
[25] *State of Rhode Island Off. of Gen. Treasurer on Behalf of Emps.' Ret. Sys. of Rhode Island v. Paramount Glob.*, 331 A.3d 179, 192 (Del. Ch. 2025) (hereafter *Proper Purpose Decision*).
[26] *Id.* at 199.
[27] *Id.* at 186.

Paramount sought certification of this interlocutory appeal, challenging the Vice Chancellor's holdings concerning both the consideration of post-demand evidence and the use of confidentially sourced reporting to demonstrate a credible basis for a demand.[28] The Vice Chancellor granted certification in his Memorandum Opinion Certifying Interlocutory Appeal.

The Skydance transaction closed on August 7, 2025.

E

On appeal, Paramount first challenges the court's consideration of post-demand evidence. It argues that the text of § 220(c) requires that a stockholder must show that it had a proper purpose for inspecting books and records at the time when the stockholder served its demand. Second, Paramount contends that the court erred when it found that the hearsay from the confidential, unnamed sources contained in the various news reports was sufficiently reliable. Paramount also believes that the court incorrectly concluded that the articles were reliable and erred in ultimately finding a credible basis to infer wrongdoing.

II

To the extent that the Court of Chancery's ruling as to the admissibility of post-demand evidence is grounded in the court's interpretation of § 220, our review

---

[28] Opening Br. at 13.

of Paramount's challenge to that ruling is *de novo*.[29]   Otherwise, trial court rulings

as to the admissibility of evidence are subject to review for an abuse of discretion.[30]

"When a stockholder seeks to investigate wrongdoing, the Court of Chancery's

determination that a credible basis to infer wrongdoing exists is a mixed finding of

fact and law, to which we afford considerable deference."[31]   Likewise, whether

hearsay in news articles is sufficiently reliable as to be worthy of consideration in

the trial court's "credible basis" inquiry is a fact-specific inquiry.   We will disturb

the result of that inquiry only if the trial court has abused its discretion.[32]

III

A

Under § 220 of the DGCL, stockholders have a right to inspect corporate

books and records.   A stockholder invokes that right by making a written demand

under oath on the corporation.   Under the version of § 220 in effect when Rhode

Island served its demand, a stockholder invoked this right by serving on the

---

[29] *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382–83 (3d Cir. 2002) (stating that "[w]hen a ruling on the admission of evidence implicates the interpretation of a legal standard . . . our review is plenary.").

[30] *Forrest v. State*, 721 A.2d 1271 (Del. 1999) (holding that the "[a]ppellate court follows [an] abuse of discretion standard when reviewing [a] trial court's decision on admissibility of evidence").

[31] *AmerisourceBergen Corp. v. Lebanon Cnty. Emps.'Ret. Fund*, 243 A.3d 417, 424–25 (Del. 2020) (citation omitted).

[32] *McLean v. State*, 482 A.2d 101, 103 (Del. 1984) (reviewing a trial court's conclusion as to the indicia of reliability of hearsay evidence and the admission of that same evidence under an "abuse of discretion" standard).

corporation a "written demand under oath stating the purpose thereof[.]"[33] If the corporation refuses to permit the inspection, the stockholder may apply to the Court of Chancery for an order compelling the inspection. Proceedings to compel an inspection under § 220 are considered summary in nature. To secure an order compelling inspection, the stockholder must exhibit its status as a stockholder, that it has complied with the statute's "form and manner" requirements, and that the purpose of the inspection is proper.[34]

The investigation of corporate wrongdoing is firmly established as a proper purpose for a § 220 inspection. As we have observed:

> For over a quarter-century, this Court has repeatedly encouraged stockholders suspicious of a corporation's management or operations to exercise this right to obtain the information necessary to meet the particularization requirements that are applicable in derivative litigation. Section 220 has thus become a widely used tool for stockholders seeking information about corporate wrongdoing, mismanagement, or waste. This development, in turn, sparked '[t]he evolution of [our] jurisprudence in section 220 actions[,] reflecting judicial efforts to maintain a proper balance between the rights of shareholders to obtain information based upon credible allegations of corporation mismanagement and the rights of directors to manage the business of the corporation without undue inference from stockholders.[35]

---

[33] 77 Del. Laws ch. 253, §§ 20–23 (2010). In March 2025, § 220 was amended. Under the current version, the demand must be under oath and be "made in good faith and for a proper purpose[] . . . [and] describe [] with reasonable particularity the stockholder's purpose and the books and records the stockholder seeks to inspect [] . . . ." which must be "specifically related to the stockholder's purpose."

[34] 8 *Del. C.* § 220 (g)(1)-(3).

[35] *AmerisourceBergen*, 243 A.3d at 426.

But bare allegations that corporate fiduciaries have engaged in wrongdoing will not suffice to trigger inspection rights. A stockholder invoking § 220 inspection rights must show, by a preponderance of the evidence, a credible basis from which the court can infer that there has been mismanagement or breach of fiduciary duty warranting further investigation. The "credible basis" standard has been described as the "lowest possible burden of proof"[36] and is satisfied by "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[37]

B

The first question Paramount's appeal poses is whether the Court of Chancery, when determining whether a stockholder has shown a credible basis to suspect wrongdoing, may consider evidence concerning events that are disclosed or occur after the stockholder has served its demand. The Court of Chancery ruled that it could, but only under exceptional circumstances:

> As a general matter, a stockholder should be limited to the evidence identified in a demand or what the stockholder knew at the time of demand because that constraint helps parties resolve Section 220 demands without judicial involvement. But there are settings when a stockholder can legitimately rely at trial at post-demand evidence, such as when a material event occurs after the demand but before trial and

---

[36] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006).
[37] *Id.*

when the stockholder's reliance on those post-demand events does not prejudice the corporation.[38]

Paramount accepts this general rule excluding post-demand evidence from the "credible basis" inquiry but would brook no exception; it advocates for a rule "that evidence that postdates a demand cannot be admitted for purposes of establishing (or disproving) a stockholder's credible basis in a § 220 action: not by a stockholder, and not by a corporation."[39]

Paramount's argument in support of a categorical rule is three-fold. First, it reads the text of § 220(c) as requiring that the court's "credible basis" inquiry look only at evidence that was available at the time of the demand. Second, it interprets Court of Chancery caselaw as providing persuasive precedent to that effect. And third, it raises policy concerns and claims that a ruling permitting consideration of post-demand evidence will unleash a wave of premature and baseless demands by stockholders who are merely hopeful that a credible basis will arise before trial. We address each argument in turn.

i

Paramount contends that § 220's text requires that a stockholder have a credible basis to suspect wrongdoing at the time it serves it demand. It bases this

---

[38] *Proper Purpose Decision*, 331 A.3d at 191–92.
[39] Opening Br. at 23.

contention on the language in § 220(c) that requires a stockholder to "first establish" a proper purpose for its inspection. Rhode Island, for its part, agrees with the Court of Chancery's conclusion that the statutory procedure, under § 220, as well as its structure, allows a stockholder to rely on post-demand evidence at the trial of a § 220 proceeding. Our reading is somewhere in between.

Paramount's emphasis on § 220(c)'s requirement that a stockholder must "first establish" its purpose is proper is, in our view, misplaced. Section 220(c)—and, in particular, the text that Paramount relies on—addresses the procedure that the Court of Chancery will follow after the corporation has refused the stockholder's demand prompting the stockholder to apply for an order compelling inspection. A fair reading of the section thus discloses what a stockholder must establish to secure an order compelling inspection. This showing is necessarily made well after the demand has been served.

On this point, we are mindful that the Court of Chancery conducted its statutory analysis in guarded terms. For instance, the court reminded that § 220 "appears to envision"[40] that a stockholder may submit a relatively terse demand and "seems to contemplate"[41] that discovery will uncover admissible evidence, all of

---

[40] *Proper Purpose Decision*, 331 A.3d at 192.
[41] *Id.*

which "suggests"[42] that both the stockholder and the petitioner should be allowed to rely on post-demand evidence.[43] Our reading aligns more closely with the trial court's interpretation than with Paramount's. We discern nothing in § 220's text that prohibits the consideration of post-demand evidence; on the contrary, we see the same signposts identified by the Court of Chancery, all of which point in the direction of admissibility under appropriate circumstances. Consequently, Paramount's text-based argument does not persuade us that the Court of Chancery erred by considering post-demand evidence in this case. We turn next to the caselaw that, according to Paramount, points up the court's error.

ii

Paramount directs our attention to several transcript rulings in which the Court of Chancery declined to consider post-demand evidence. Our review suggests that the issue has not been squarely resolved in the Court of Chancery.

---

[42] *Id.* Our reference to this statement by the Court of Chancery is not intended—as our dissenting colleagues seem to suggest—as an endorsement of the view that post-demand discovery may be used to fortify an otherwise deficient inspection demand. Rather, we cite the statement because it expressed, as we understand it, the Court of Chancery's sense, which we share, that the structure of §220 does not constrain the court's discretion to consider post-demand evidence. It should be noted that here Rhode Island did not uncover the post-demand evidence through discovery; to the contrary the evidence was made known to the public through news accounts and Paramount's public disclosures.
[43] To be clear, the court opined that "[t]he statutory procedure for Section 220 suggests that a petitioner should be able to rely on post-demand evidence about pre-demand events, "while" a corporation should be able to rely on post-demand evidence about the stockholder and its demand." *Id*.

19

In all but one of the cases cited by Paramount, the court declined to consider post-demand evidence on grounds unrelated to the timing of the evidence. For example, in *Cutler v. Quiq, Inc.*,[44] stockholder plaintiffs noticed a 30(b)(6) deposition of a corporate representative. The court granted the company's motion for a protective order disallowing the deposition, characterizing the deposition request as an attempt to "use the discovery process in a books and records case to gain access to the books and records ultimately at issue."[45] The court rejected only the plaintiff's "circular[]" attempt to use the discovery process to achieve its ultimate goal—not the plaintiff's use of post-demand evidence at trial.[46]

In *Rudnick v. Chatham Capital Corp.*,[47] the court denied a deposition request on similar grounds. The court held that a stockholder cannot use the § 220 discovery process to discover "the documents, essentially, which are the same set of documents you would get if you succeed [in the ultimate books and records proceeding]."[48] So neither *Cutler* nor *Rudnick* draw the bright line rule that Paramount seeks.[49]

---

[44] C.A. No. 6897-VCG (Del. Ch. March 1, 2012) (TRANSCRIPT), submitted in Compendium of Transcripts Cited in Appellant's Opening Brief, D.I. 8, Tab 1.
[45] *Id.* at 17:22-24.
[46] *Id.* at 20:11.
[47] C.A. No. 3010-VCS (Del. Ch. Mar. 12, 2008) (TRANSCRIPT), submitted in Compendium of Transcripts Cited in Appellant's Opening Brief, D.I. 8, Tab 4.
[48] *Id.* at 22:18-19.
[49] *Id.* at 34:23-24, 35:1-6.

This pattern repeats in *Plumbers & Steamfitters Local Union No. 248 Pension Fund v. Wal-Mart Stores, Inc.*[50]  In that case, a stockholder plaintiff presented as its only evidence of a credible basis the comments of two United States representatives suggesting "issues" within Wal-Mart's management and "rote" sections from Wal-Mart's 8-K identifying the types of misconduct that might arise when operating an international business.[51]  The stockholder moved for court-ordered discovery.  The court denied the stockholder's motion, reasoning that the discovery sought was inappropriate in light of the sparsity of the evidence supporting the stockholder's suspicion of wrongdoing.  The court's ruling turned on the reasonableness of the extent of discovery sought, not the post-demand nature of the evidence.[52]

One Court of Chancery case tackles the issue head-on.  In *In re New Relic, Inc.*, the same Magistrate who rejected post-demand evidence in this case held that post-demand evidence in the form of documents the corporation had produced that it claimed "undermined the claimed wrongdoing" could not be considered.[53]  But that decision does not cite caselaw or explain the reasoning behind the court's exclusion of the evidence.  Exceptions were taken, but the rejection of the company's post-demand evidence was not an issue on appeal.

---

[50] C.A. No. 7725-CS (Del. Ch. May 20, 2013) (TRANSCRIPT), submitted in Compendium of Transcripts Cited in Appellant's Opening Brief, D.I. 8, Tab 3.
[51] *Id.* at 10:8-20.
[52] *Id.* at 10:1-24.
[53] C.A. No. 2023-1089-SEM, at 17:11 (Del. Ch. July 22, 2024) (TRANSCRIPT), submitted in Compendium of Transcripts Cited in Appellant's Opening Brief, D.I. 8, Tab 2.

By contrast, a recent decision from this Court relied on post-demand evidence when we concluded that there was a credible basis for a stockholder's suspicion of wrongdoing. In *Wong Leung Revocable Trust v. Amazon.com, Inc.*, we found a credible basis based in part on a federal court decision that allowed an antitrust complaint against Amazon to proceed past the motion to dismiss stage.[54] The decision was published after the demand and after the magistrate's ruling in the books and records action. Nevertheless, this Court concluded that the stockholder plaintiff had "satisfied its burden of proving a credible basis, especially considering the developments in the FTC action since the magistrate issued the final report."[55] Although this Court did not address the arguments presented in this appeal, our credible basis determination relied on post-demand evidence of post-demand conduct.[56]

In sum, the Court of Chancery's practice as reflected in the transcript rulings does not, in our view, weigh in favor of the adoption of a categorical rule that excludes post-demand evidence in all cases.

iii

Paramount next argues that the policy goals underpinning § 220 support limiting the "credible basis" inquiry to pre-demand evidence. To conclude

---

[54] 345 A.3d 965, 978 (Del. 2025).
[55] *Id.*
[56] *Id.*

22

otherwise, according to Paramount, would encourage premature demands and "fishing expeditions in search of wrongdoing."[57] This would, or so Paramount argues, interfere with the efficient resolution of stockholder demands without court intervention and place an undue burden on the Court of Chancery. The Court of Chancery's opinion allowing consideration of post-demand evidence, Paramount argues, "invites stockholders to use the Section 220 demand process to keep corporate books and records open in perpetuity as long as some rumors about the corporation circulate in the news, even if alleged wrongdoing has not occurred."[58]

Rhode Island responds to Paramount's parade of horribles by highlighting the inefficiencies that would attend a categorical barring the Court of Chancery from considering post-demand evidence under any circumstances. In particular, Rhode Island—agreeing with the Court of Chancery—points to the efficiency gained by allowing a stockholder to proceed on an existing demand with the benefit of post-demand evidence rather than, as the Court of Chancery put it, "go[ing] back to square one and serv[ing] a new demand"[59] when post-demand evidence surfaces. Rhode Island also highlights that the Court of Chancery's procedures in § 220 proceedings provide the parties with ample notice of the evidence that will be offered at trial,

---

[57] Opening Br. at 21.
[58] App. to Opening Br. at A297 (Application of Certification of Interlocutory Appeal).
[59] *State of Rhode Island Off. of Gen. Treasurer on Behalf of Emps.' Ret. Sys. of Rhode Island v. Paramount Glob.*, 2025 WL 894501, at *7 (Del. Ch. Mar. 24, 2025).

23

eliminating Paramount's concerns about surprise and prejudice. Finally, Rhode Island rejects the notion that allowing parties to introduce post-demand evidence will encourage "fishing expeditions."

In fairness to the parties, we view the policy considerations as cutting both ways. On the one hand, allowing post-demand evidence to be considered at trial does carry some risk that stockholders might serve thinly supported demands in the hope of backfilling their case for inspection with post-demand evidence. On the other hand, the rule Paramount urges us to adopt would likely create otherwise avoidable inefficiencies. For instance, upon the development of material post-demand evidence, the stockholder would be required to serve a new demand and, upon the corporation's refusal, file a new complaint. Failing that, the Court of Chancery would be forced to disregard evidence that is material to either the stockholder's demand or the corporation's defense. On balance, given our conclusion that § 220 itself does not by its terms prohibit the introduction of post-demand evidence, we deem it best to allow the judicial officers of the Court of Chancery to exercise their discretion and to consider or reject post-demand evidence on a case-by-case basis. In this regard, we are confident in the Court's ability to monitor its § 220 docket and take appropriate steps to discourage abusive practices by stockholder plaintiffs.

We are equally satisfied that the Court of Chancery's articulation of the general rule subject to exceptions, as previously quoted,[60] is a correct statement of the law. The general rule is that when a stockholder seeks relief under § 220, it will be limited to evidence identified in the demand and the information available to the stockholder when the demand was made. But under exceptional circumstances, the Court of Chancery may, in the exercise of its sound discretion, consider post-demand evidence that is material to the court's credible-basis inquiry and not prejudicial to the corporation.

## C

Paramount next contends that it should prevail even under the rule that the Court of Chancery articulated and that we now adopt. This is so, Paramount contends, because the use of post-demand evidence prejudiced Paramount by exposing it to "needless time-consuming and costly litigation."[61] This contention is based on the premise that Rhode Island's demand in April 2024 was premature and thus caused Paramount to engage in unspecified, wasteful litigation activity until Rhode Island served its second demand in October 2024. This assumes that the April demand was premature. The Court of Chancery rejected that argument, and it is not before us now on appeal. Moreover, we agree with the Court of Chancery that the

---

[60] See p. 16, *supra*.
[61] Opening Br. at 20.

25

circumstances surrounding Rhode Island's reliance on post-demand evidence militate against a finding that Paramount suffered prejudices. Those circumstances include that: the evidence "pertain[ed] to the Company's own conduct,"[62] the parties stipulated to the admissibility of certain post-demand evidence, and Paramount did not object to the use of the evidence before trial and offered its own post-demand evidence to the court. We see no error in the Court of Chancery's conclusion that the post-demand evidence in question did not prejudice Paramount.

D

In its challenge to the Court of Chancery's reliance on hearsay—statements in news articles attributed to unnamed, confidential sources—in its "credible basis" determination, Paramount does not contest the proposition that hearsay in news articles, if found to be sufficiently reliable, can support a "credible basis" finding. Instead, Paramount's argument, as we understand it, presents two issues. The first—and major—thrust of Paramount's argument is that the Court of Chancery erred by adopting a general rule, to be applied in § 220 summary proceedings, that hearsay statements in news articles will be deemed reliable so long as the news outlet that has published the articles is reputable. Its second contention, implicitly woven into its first, is that, had the court properly assessed the reliability of the hearsay evidence without applying this rule, it could only have found the evidence unreliable and,

---

[62] *Proper Purpose Decision*, 331 A.3d at 195.

hence, inadmissible. As to the first issue, Paramount takes aim at the Court of Chancery's formulation of the applicable evidentiary principles, and thus we review it *de novo*.[63] We review the second issue, however, for an abuse of discretion.[64]

i

The Court of Chancery rightly observed that "[a] stockholder can rely on hearsay to provide a credible basis to suspect wrongdoing, so long as the hearsay carries sufficient guarantees of trustworthiness."[65] This observation was predicated on our statement in *NVIDIA Corporation v. City of Westland Police and Fire Retirement System* that "in the § 220 context, the use of 'sufficiently reliable hearsay' is allowed."[66]

Here, the Court of Chancery found that, on the facts of this case, the news articles and the hearsay statements contained within them "bear sufficient reliability

---

[63] *Williams v. Hall*, 2025 WL 35922, at *2 (Del. Jan. 6, 2026) ("[Q]uestions of law, including evidentiary standards and the Court of Chancery's application of legal rules, are reviewed *de novo*.")

[64] *Williams v. State*, 707 A.2d 350, 354, 357 (Del. 1998) ("[W]e review for an abuse of discretion questions concerning the admissibility of evidence.") We note that *Williamson* predated the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). Before *Crawford*, reliability and trustworthiness were critical factors in assessing the admissibility of hearsay statements and the impact they have on a defendant's Sixth Amendment Confrontation Clause Rights. *Crawford* changed that, but we do not cite *Williamson* in the Confrontation Clause context. Rather, we cite it for the proposition that, when a court is charged with assessing the reliability of a hearsay statement, it engages in a fact-specific inquiry that will not be overturned on appeal absent an abuse of discretion. We note further that Paramount acknowledges that, in the § 220 context, Delaware courts use a fact-specific inquiry to determine whether hearsay statements are reliable.

[65] *Proper Purpose Decision*, 331 A.3d at 195.

[66] 282 A.3d 1, 22 (Del. 2022).

to be considered."[67]  This finding appears to be grounded in the court's view that "[n]ews articles *from reputable publications* that rely on anonymous sources will generally be sufficiently reliable for a court to consider when assessing whether a stockholder has a credible basis to suspect wrongdoing."[68]  Paramount reads this statement as creating an impermissible shortcut around an appropriately searching analysis of proffered hearsay's reliability and as heedlessly opening the door to any and all hearsay so long as it is recounted in a "reputable publication."  Were we to read the statement in isolation from the balance of the Court of Chancery's opinion, we too would be uneasy with it.  But, having read the statement in the context of the court's entire opinion, we are satisfied that the court did not rely exclusively on the news outlets' reputations. We are satisfied, moreover, that the court conducted a reliability analysis that passes muster under our review standard.

ii

Paramount acknowledges that Delaware law "does not endorse a categorical rule of law" as to what constitutes sufficiently reliable hearsay in a § 220 proceeding.[69]  The inquiry is, as we said before, a fact-specific inquiry.  Here, the Court of Chancery's inquiry considered a multitude of factors before concluding that

---

[67] *Proper Purpose Decision*, 331 A.3d at 183.
[68] *Id.* at 199 (emphasis added).
[69] Opening Br. at 33 (quoting *Paul v. China Media Express, Holdings, Inc.*, 2012 WL 28818, at *5 (Del. Ch. Jan. 5, 2012)).

the hearsay in the news articles was sufficiently reliable and worthy of consideration in its "credible basis" analysis.

The court took into account: the number of articles (47) with an emphasis on the quotations they contained; instances when the Company's public filings confirmed the assertions in the news reports; the reputations of the news outlets, but also the stature of the reporting journalists; the level of specificity in the assertions; the absence of indica of unreliability or conspiratorial undertones; and Paramount's own reliance on news articles bearing the same characteristics as the articles proffered by Rhode Island.

Might the Court of Chancery, in the exercise of its discretion, have concluded otherwise and found the evidence insufficiently reliable? Of course. Some of the reports were not corroborated by independent evidence, and the identity of the sources was not disclosed. These factors led the Magistrate to exercise her discretion in a manner that Paramount favors. That the Vice Chancellor who conducted this fact-specific inquiry *de novo* reached the opposite conclusion does not mean that the court abused its discretion by doing so. As Justice Holland once observed, "[i]n the absence of legal error, decisions that are entrusted to the discretion of a trial court are by their very nature exercised within a range of choices that may go either

way."[70]  The Court of Chancery's reliability determination, in our opinion, falls within the permissible range of choices available in this case.

IV

For the reasons set forth above, we affirm the judgment of the Court of Chancery, to which we remand the case for further proceedings consistent with its January 29, 2025 Opinion Addressing Stockholder's Proper Purpose.  Jurisdiction is not retained.

---

[70] *Homestore, Inc. v. Tafeen*, 886 A.2d 502, 506 (Del. 2005).

**SEITZ**, Chief Justice; and **VALIHURA**, Justice, Dissenting.

We accepted Paramount Global's interlocutory appeal to consider two legal issues: whether a stockholder can rely on post-demand or post-petition evidence at trial to determine the credible basis for a Section 220 demand; and whether a stockholder can rely on information from confidential sources without identifying the sources and assessing the speaker's credibility. We agree with the Majority's analysis and conclusion on the confidential source issue but respectfully disagree about the use of post-demand/post-petition evidence at trial to determine the credible basis for the demand.

Our Court has yet to resolve the evidentiary issue. We recognize the Majority's and the Court of Chancery's practical observation – a stockholder denied the use of post-demand/post-petition evidence at trial can simply submit a new demand, as was the case here. At bottom, however, we are making a policy choice. The Majority acknowledges that the policy considerations "cut[] both ways."[1] In our view, the better choice is to bar admission of post-demand evidence, instead of a case-by-case basis discretionary decision proposed by the Majority. Our rule will discourage a premature race to the courthouse to attempt to gain a foothold for later merits-based litigation. Thus, we respectfully dissent.

---

[1] Majority Op. at 24.

As an initial matter, we observe that, under Section 220(c), a stockholder can only seek relief in the Court of Chancery "[i]f the corporation . . . refuses to permit an inspection by a stockholder . . . or does not reply to the demand within 5 business days after the demand has been made[.]"[2] "[T]he five-day waiting period gives the company a brief litigation-free window to consider the demand '*before litigation is initiated.*'"[3] The Court of Chancery has described the five-day period as "jurisdictional."[4]

In *Floreani v. FloSports, Inc.*, we recently affirmed the Court of Chancery's decision denying inspection rights to stockholders who failed to wait five business days after making their third demand before moving to amend the complaint to incorporate the third demand. In a similar vein, allowing the stockholder to rely on post-demand evidence at trial without making a new demand undercuts the five-day litigation freeze and the possibility of an out of court resolution.

In any event, confining stockholders to evidence in existence at the time of the demand discourages stockholders from filing Section 220 litigation lacking a concrete basis at the time of the demand. This case is a good example. After

---

[2] 8 *Del. C.* § 220(c).

[3] *Floreani v. FloSports, Inc.*, __ A.3d __, 2025 WL 3275207, at *10 (Del. Nov. 24, 2025) (quoting *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 146 (Del. 2012)) (emphasis in original).

[4] *See, e.g.*, *MaD Invs. GRMD, LLC v. GR Cos., Inc.*, 2020 WL 6306028, at *1 (Del. Ch. Oct. 28, 2020).

expending precious judicial resources litigating the stockholders' original demand, and while exceptions were pending, Paramount received another demand from this plaintiff and demands from several other stockholders directed at an actual announced transaction.[5]  In response, Paramount worked with the stockholders – including Rhode Island – to provide books and records responsive to the demands. One can argue persuasively that, given the renewed demands, the first demand, and litigation filed to vindicate it, were a waste of judicial resources.  By cutting off the evidentiary record at the time of the demand, stockholders are incentivized to bring books and records disputes only after the dispute has matured into a concrete dispute or transaction.

The Majority reasons that, combined with "a relatively terse demand," Section 220 "'seems to contemplate' that discovery will uncover admissible evidence," and therefore, the stockholder "should be allowed to rely on [such] post-demand evidence" to prove its proper purpose at trial.[6]  But discovery in a Section 220 action is unlike post-litigation discovery on the merits of a claim.  Under Section 220(c), the Court of Chancery is entitled to "*summarily* order the corporation to permit the stockholder to inspect . . . its [ ] books and records . . . ."[7]  In this vein, Section 220

_____

[5] A291–96 (Rhode Island Oct. 25, 2024 Demand).

[6] Majority Op. at 18–19 (quoting *Proper Purpose Decision*, 331 A.3d at 192) (footnote omitted).

[7] 8 *Del. C.* § 220(c) (emphasis added).

proceedings are "not meant as a replacement for discovery under [Del. Ch. Ct.] Rule 34," which occurs in plenary actions.[8] Section 220 discovery should be narrow and tailored to the basis for the demand instead of requiring Magistrates and Vice Chancellors to sort out the materiality of later events.

Finally, we are unpersuaded by the Majority's attempt to limit post-demand evidence to "when a material event occurs after the demand but before trial and when the stockholder's reliance on those post-demand events does not prejudice the corporation."[9] Litigation over what events are "material" will add one more layer of complexity to what should be a summary proceeding. Stockholder books and records demand litigation should be prompt, streamlined and narrow. That purpose is best served by holding stockholders to the basis for their demand at the time of the demand. We respectfully dissent.

---

[8] *Kaufman v. CA, Inc.*, 905 A.2d 749, 753–54 (Del. Ch. 2006) (citing *Sec. First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, 570 (Del. 1997)).

[9] Majority Op. at 16–17 (quoting *Proper Purpose Decision*, 331 A.3d at 191–92).